# EXHIBIT A



# Wiegand Sports LLC

Wiegand Sports LLC
3573 Apple Mill Cove, Suite 6
Salt Lake City, UT 84109

Jiminy Peak Mountain Resort, Inc
37 Corey Road

Hancock, MA 01237
USA

**final Invoice**
Date:          30.09.2007
Customer:      11875
Contract:      02.12.2005

Executive: Mr Jürgen Ruschke, Tel-No.:(801) 277 - 6795
Project:   Alpine Coaster Run „Jiminy Peak" Massachusetts

Dear Sirs,

according to the purchase, delivery, assembly and inspection contract we charge for final inspection, testing and qualification of the Alpine Coaster as following:

First year warranty payment fee Alpine Coaster Run Jiminy Peak

**final amount     $ 162,962.94**

Please instruct your bankers to direct all payments through:
Wells Fargo Bank, N.A., 3895 South Wasatch Blvd.,
Salt Lake City, Utah 84109
to credit of account-no. 606-9272356
Wire transfer information: Routing-no. 121000248 SWIFT: WFBIUS65

Or sent a check to the following adress:

Wiegand Sports LLC
3573 Apple Mill Cove, Suite 6
Salt Lake City, UT 84109

We thank you for the trust you have shown in our company, and for the pleasant cooperation resulting from it. We hope that your new attraction will be a great success and remain. With this final payment the Alpine Coaster changes into the ownership of the Jiminy Peak Mountain Resort Inc.

Jürgen Ruschke
General Manager
Wiegand Sports LLC

Seite 1 von 1

## CONSULTING, PURCHASE, DELIVERY, ASSEMBLY, AND INSPECTION CONTRACT

THIS PURCHASE, DELIVERY AND ASSEMBLY CONTRACT (the "Agreement") is made this 02 day of December, 2005 (the "Effective Date"), by and between Jiminy Peak Mountain Resort, Inc., a Massachusetts corporation, doing business at 37 Corey Road, Hancock, Massachusetts 01237, USA, hereinafter referred to as "BUYER" and Wiegand Sports, LLC, a Utah limited liability company, doing business at 3573 Apple Mill Cove, Suite 6, Salt Lake City, Utah 84108, hereinafter referred to as "SELLER".

### Witnesseth

WHEREAS, SELLER is a distributor of Summer Toboggan Runs, Alpine Coasters, Uplift Systems, Bobcart Circuits, Waterslides and other assorted slides.

WHEREAS, BUYER desires to purchase from SELLER, a Wiegand Alpine Coaster sports facility, consisting of 46 Coaster sleds and related parts and equipment and which products have been or will be manufactured by SELLER and/or its affiliate, Wiegand GmbH & Co.KG. The Alpine Coaster and related equipment will be installed by Seller's employees with the cooperation of Buyer's designated personnel.

IN CONSIDERATION of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. Consulting; Purchase and Sale; Inspection; Pricing

    (a) Consulting. Pursuant to the terms of this Agreement, SELLER shall perform consulting services for BUYER (to include an on-site visit by a Wiegand factory technician) for the purposes of inspecting and analyzing the Jiminy Peak Mountain Resort site to determine the line that the track will follow. Subject to the adjustments provided in Section 1(d) below, the fee for such consulting shall be $32,478.55 ("Consulting Fee").

    (b) Purchase and Sale. Pursuant to the terms of this Agreement, SELLER shall sell and deliver ex works and install for BUYER and BUYER shall purchase and receive from Seller the Alpine Coaster, related parts, products and equipment as specified as follows
    790 m (2600 ft) Alpine Coaster compl. uphill-transportation Liftersystem
    consisting of straight sections, curves, bows and jumps
    upto 1 m (3,28 ft) height
    approx. 140 m ( 460 ft ) upto 2 m (6,5 ft ) height
    approx.  90 m ( 295 ft ) upto 3 m (10  ft ) height
    approx.  50 m ( 165 ft ) upto 4 m (13  ft ) height
     46 pcs. Alpine Coaster sleds incl. centrifugal brakes
     46 pcs. safety packages
     46 pcs. clamps for uphill transportation
    approx. 280m (920 ft ) safety nets
    1 Wiegand Liftersystem inkl. 30 kW driving station
    approx. 305 m (1.000 ft) uphill track upto 1 m (3,28 ft) height
    cable channel for uphill trackline
    approx.  70 m ( 230ft ) upto 2 m (6,5 ft ) height
    approx.  50 m ( 165 ft ) upto 3 m (10  ft ) height
    approx.  20 m ( 65 ft ) upto 4 m (13  ft ) height
    approx. 140 m ( 460 ft ) banister with handrail
    selective braking system (SBS)
    Automatic storage system

    Subject to the adjustments provided in Section 1(d) below, the Project Price for the Alpine Coaster, related parts, products and equipment shall be $493,673.96 ("Purchase Price"). Delivery is scheduled for mid-April, 2006.

*[handwritten margin note: "File New Deals MB "Wiegand""]*

(c) <u>Inspection and Qualification.</u> Pursuant to the terms of this Agreement, SELLER shall perform inspection and qualification services for BUYER for the purposes of final inspection, testing and qualification of the Alpine Coaster. Subject to the adjustments provided in Section 1(d) below, the fee for such inspection and qualification shall be $123,418.49 ("Inspection Fee").

(d) <u>Pricing.</u> Collectively, the Consulting Fee, the Purchase Price and Inspection Fee constitute the Project Price; being an aggregate of US$ 649,571.00 (the "Project Price"). BUYER shall pay SELLER the Project Price in exchange for the delivery of the Alpine Coaster and the performance by SELLER of its obligations specifically set forth herein and in Addendum "A", attached hereto, which Project Price will be paid to Seller in the amounts as specified in Section 2 below.

In the event, the US Dollar to Euro currency exchange rate should fall below the current 1.00 to 1.18 exchange rate (Dollar devaluation) as posted by the Wall Street Journal, BUYER agrees to compensate SELLER for fifty percent (50%) of any such devaluation and the applicable exchange will be applied on the due date of any given payment. Likewise, if the US Dollar to Euro currency exchange rate should rise above the current 1.00 to 1.18 exchange rate (Euro devaluation) as posted by the Wall Street Journal, Seller agrees to compensate Buyer for fifty percent (50%) of any such devaluation.

Any additional goods or services requested by BUYER and provided by SELLER which are not expressly described or stated in this Agreement must be specified in writing and signed by both parties and shall be invoiced separately, and will be in addition to the Project Price. All such additional invoices shall be payable within 30 days after receipt by Buyer. SELLER will provide BUYER with a final invoice based on the count/measurement of track segments installed when installation work has been completed. Such additional cost, if any, will be based on prices set forth in Addendum A.

(e) <u>Items Included in Project Price.</u> The Project Price includes all costs of the design, engineering and construction of the Alpine Coaster. The Project Price also includes costs for planning and design of the Alpine Coaster including, but not limited to, an on-site visit by a Wiegand factory technician for purposes of inspection of the Jiminy Peak Mountain Resort site and determination of the line that the track will follow, production of the planning drawings and calculation of the framework for all individual parts required for construction.

2. Payment Terms

BUYER shall pay SELLER for the Alpine Coaster as detailed in Section 1 above as follows:

2.1 The Consulting Fee is due and payable on November 30, 2005 for 32,478.55.

2.2 A portion of the Purchase Price in the amount of $162,392.17 is due on December 2, 2005.

2.3 A portion of the Purchase Price in the amount of $194,871.30 is due and payable on the fifteenth day of January 2006.

2.4 A portion of the Purchase Price in the amount of $45,469.97 shall be due on the date of delivery of the Alpine Coaster Ride on April 15, 2006.

2.5 A portion of the Purchase Price in the amount of 45,469.97 shall be due on upon installation of the Ride on June 15, 2006.

2.6 A final payment of $45,469.97 of the Purchase Price shall be due on November 1, 2006.

2.7 The Inspection Fee shall be due on September 1, 2007 for $123,481.49.

All of the payments detailed above shall be effected via wire transfer to the Wiegand Sports, LLC, wire instructions will be notified to BUYER by SELLER in writing. BUYER will provide SELLER with an acceptable bank guarantee or an irrevocable letter of credit for the Inspection Fee due on September 1, 2007.

3. Shipment; Freight, Customs and Duty. SELLER shall arrange for shipment of the Alpine Coaster to the Jiminy Peak Mountain Resort Site ("Work Site") and BUYER shall bear all reasonable costs, responsibilities, insurance, risk of loss, import duties, reasonable transportation expenses, and obligations arising from such shipping of the Alpine Coaster to the Installation Site. Notwithstanding the foregoing and paragraph 1 of the Price/Payment/Reservation of Proprietary Rights section of the General Terms and Conditions set forth on Addendum C, SELLER shall be responsible for the costs of all packaging in connection with the shipping of the Alpine Coaster. SELLER shall provide to BUYER a written estimate of the total shipping costs in connection with the terms of this section no later than the Effective Date. The terms of each shipment hereunder are ex works in Rasdorf, Germany. Ownership of the Alpine Coaster (including, but not limited to, title and right of disposal) shall not pass from Seller to Buyer until Seller has received payment in full of the Project Price from Buyer.

4. Delivery Schedule; Quality; Import/Export Fees; Acceptance

(a) SELLER shall ensure that the Alpine Coaster meets or exceeds the quality standards set forth in Section 10 of this Agreement, and the delivery deadline set forth in Addendum "B" attached hereto.

(b) Provided that BUYER satisfies its obligations set forth in this Agreement in a timely fashion, SELLER shall deliver Alpine Coaster and perform the assembly, installation and inspections thereof pursuant to the delivery schedule set forth in Paragraph 1b.

(c) BUYER shall ensure compliance with all applicable import and export laws that relate to delivery, assembly and installation of the Alpine Coaster, and BUYER shall obtain any and all required import/export documents necessary for the delivery, assembly and installation of the Alpine Coaster. BUYER shall also assume all costs, fees, and expenses associated with applicable tariff, import and export laws relating to delivery, assembly and installation of the Alpine Coaster, including all taxes related thereto.

5. Changes and Extra Work

A. Any changes or additional work requested by BUYER to be effective must comply with the following specific procedures:

(I) Upon identification of a potential change to the purchase order or for additional work not occurring as a result of SELLER's actions not in compliance with its obligations hereunder, BUYER shall immediately notify SELLER in writing of the requested change or additional work. The writing must clearly describe in detail the change and/or all of the extra work to be performed. SELLER shall then submit a supplementary quotation covering the change or additional work to be performed.

(II) If BUYER and SELLER agree upon a change or additional work and the price to be charged therefore, BUYER will issue to SELLER a Change Order for the Alpine Coaster. Upon receipt of the fully executed Change Order from BUYER and SELLER, SELLER shall proceed and complete the extra work in accordance with the schedule established in the Change Order.

      (iii)   Any and all efforts performed by SELLER pursuant to the Change Order shall be considered to have been additional effort performed only at such price agreed upon in the issued Change Order.

      (iv)   SELLER may refuse any requested change or request for additional work if it is determined by SELLER, in its sole discretion, that the change or requested additional work will impede the proper functioning of the Alpine Coaster or impede its installation or safety.

6.   Design and Testing.

(a) SELLER shall design and test the Alpine Coaster to ensure that it meets or exceeds the design specifications set forth in Exhibit "A" attached hereto.

(b) BUYER shall inspect and perform final testing of the fully assembled and installed Alpine Coaster at the installation site.

(c) Except as otherwise provided in this Agreement, SELLER shall bear all costs and expenses relating to the design of the Alpine Coaster.

(d) Prior to the Effective Date, BUYER will ensure that the proposed design, assembly and installation of the Alpine Coaster will qualify for certification by all appropriate architectural, safety and engineering standards applicable thereto, and as are required to enable BUYER to obtain all necessary building permits for construction and operation of the Alpine Coaster. In order to allow BUYER to meet the foregoing obligations, SELLER shall provide to BUYER the proposed design, assembly, installation, operation and maintenance specifications of the Alpine Coaster no later than 60 days prior to the Effective Date.

(e) SELLER shall provide to BUYER all drawings and specifications for the Alpine Coaster and the installation, operation and maintenance thereof in the English language. This information, along with estimates, drawings, calculations, technical data and other documents between the SELLER and BUYER may be disclosed by BUYER, as necessary, to its insurance carrier, contractors and all local, state and federal agencies having jurisdiction over the Jiminy Peak Mountain Resort location and the use of the Alpine Coaster.

7. Assembly and Installation. SELLER shall be solely responsible for the proper assembly and installation of the Alpine Coaster at the installation site in compliance with all codes, laws, permits, and approvals disclosed to SELLER by BUYER. For purposes of the assembly and installation of the Alpine Coaster, BUYER shall provide the necessary assemblers (the "Assemblers") as requested by SELLER's Supervisors until the installation work is satisfactorily completed. SELLER shall supply a sufficient number of Supervisors to organize and manage the assembly and installation work. For purposes of this Agreement, "Working Days" shall mean days of the week (including Saturdays, not Sundays and holidays) in which such assembly and installation can be performed for not less than eight (8) hours each day, without adverse weather conditions of rain, snow or freezing conditions reasonably preventing such assembly and installation (the "Weather Conditions"). In the event of such Weather Conditions, the Working Days shall be extended by mutual agreement of the parties hereto by the number of days (or portions thereof) in which the Weather Conditions reasonably prevent such assembly and installation and the Handing Over Date shall be similarly extended. The duties and responsibilities of SELLER'S Chief Supervisor shall include (but shall not be limited to) the following, as appropriate:

    (a)   Communicate and correspond with BUYER'S management regarding the assembly of the Alpine Coaster;

    (b)   Address issues concerning access to technical documentation and other technical resources, access and effectiveness of design and testing of the Alpine Coaster;

    (c)   Ensure compliance with all technology requirements and specifications related to the Alpine Coaster;

4

    (d)    Supervise and monitor the progress of the assembly and installation of the Alpine Coaster;

    (e)    Schedule on-site visits of management and technical personnel in order to avoid or minimize disruption of business operations of BUYER; and

    (f)    Coordinate and schedule meetings of each party's technical personnel;

    (g)    Advise the parties of the status of the delivery, assembly, installation, testing, qualification and inspection of the Alpine Coaster.

8.     Rights and Obligations of BUYER

    (a)    Additional Expenses. Except as otherwise provided herein, BUYER shall remain solely responsible for the payment of all expenses incurred in connection with topographical maps and surveys of the installation site, earthwork for the preparation of the track way line and the installation site (including drainage, grading, mounding, cut and fill and preparing the landscape) the top and bottom stations, room, board and travelling (such travel expenses not to exceed $5,000.00) expenses of the SELLER'S Supervisors, and for the payment for and procurement of all local building, construction, operating and other necessary permits as well as fees for stamping of drawings by a locally registered professional engineer, the cost of passenger loading, unloading, and access ramps (collectively, the "Additional Expenses"). BUYER shall pay the Additional Expenses directly; provided, however, BUYER shall reimburse SELLER for all reasonable Additional Expenses paid by SELLER upon SELLER's presentation to BUYER of copies of all associated invoices and receipts for same. In the event SELLER pays or otherwise becomes liable for the payment or reimbursement for other expenses which result from either (i) BUYER's failure to timely perform its obligations hereunder, or (ii) assembly or installation of the Alpine Coaster which is not complete prior to the "Handing Over Date" (as defined in Addendum "A" attached hereto), and such failure to complete such assembly or installation is caused either by (x) events of force majeure described in Section 11 hereof (the "Force Majeure Events"), or (y) BUYER's failure to fulfill its obligations pursuant to this Agreement, including its obligation to pay the portions of the Project Price hereunder as and when due, then, in each such case, BUYER shall be solely responsible for the payment or reimbursement of such Additional Expenses, as appropriate.

    (b)    Local Taxes and Fees. The Project Price does not include any applicable federal, state sales or local sales taxes and fees, or any personal property or real estate property taxes which may be imposed by any applicable taxing authority upon the sale of the Alpine Coaster or upon the use thereof by BUYER, for which BUYER will remain solely responsible for payment.

    (c)    Final Testing by Buyer. Following the complete assembly and installation of the Alpine Coaster at the Installation Site, and prior to the Handing Over Date, BUYER shall be entitled to inspect and test the Alpine Coaster, to ensure that it conforms to the specifications described herein, and to ensure that the design, installation and performance of the of the Alpine Coaster meets specifications and all applicable codes. BUYER will promptly notify SELLER in writing if the Alpine Coaster is rejected for any reason. The date on which the Ride is opened to and used by BUYER's customers, is deemed to constitute full acceptance of the Alpine Coaster by BUYER.

    (d)    Maps, Surveys, and Site work. BUYER has provided topographical maps and surveys of the Installation Site, and shall complete, all earthwork necessary for the preparation of the track way line and the Installation Site so that the installation can commence in an unimpeded and timely fashion (including drainage, grading, mounding, cut and fill and preparing the landscape).

    (e)    Access to Site. BUYER will provide SELLER and its personnel, agents and contractors undisturbed and unimpeded reasonable access and connection ways between

5

the unloading area of components of the Alpine Coaster and the erection site. BUYER will be responsible for unloading of arriving containers at the unloading area.

(f) Timely Decisions. BUYER will make timely decisions and communicate such to SELLER whenever that is required in order not to delay the design, manufacture, delivery, or installation of the Alpine Coaster, and giving any other actual support and input reasonably requested by SELLER. Any delays in any of the above may result in an equal delay in delivery and/or installation of the Alpine Coaster.

(g) Electrical Supply. BUYER shall provide for a main power supply rated at 480 volt three phase to the site necessary to assemble, install and operate the Alpine Coaster. Information on the size and of the power supply cable and supply net type has to be provided by SELLER.

(h) Equipment. BUYER shall make available to SELLER, at BUYER's expense the following equipment for delivery and installation of the Alpine Coaster: one car crane or forklift (with long forks) to unload and transport pallets with tracks and steel structure, and a small truck or pickup. BUYER shall assist SELLER in obtaining other equipment reasonably required by the Supervisor. BUYER shall make sure that the Assemblers have access to a mobile source of electricity for each point of the track way.

(i) Operation of Alpine Coaster. BUYER shall ensure that only trained personnel will operate the Alpine Coaster in accordance with the design specifications and written operating and maintenance instructions provided by SELLER, to the extent such instructions do not conflict with applicable regulatory or insurance authorities' instructions. BUYER will make certain that each customer riding the Alpine Coaster signs a standard waiver form disclaiming liability for any injuries sustained and shall take all necessary preventive measures in order to ensure rider safety. BUYER shall provide a copy of the waiver to SELLER prior to the Handing Over Date.

(j) Product Liability Insurance. SELLER will purchase product liability insurance for the Alpine Coaster, which is based on the Project Price plus installation costs. In order to cover a portion of the insurance costs, BUYER agrees to pay to SELLER five percent (5%) of the aggregate of the price of the Alpine Coaster plus installation costs, upon presentation of invoice therefore from SELLER. BUYER shall be an additional insured on the policy. In the event SELLER chooses to renew for additional periods, BUYER shall have the option to remain an additional insured, based on the same premium ratio as stated in this Section 8(j). In addition, BUYER will maintain personal injury insurance at its own expense at all times so long as BUYER operates Wiegand sports facilities at the Jiminy Peak Mountain Resort site.

9. Default and Remedies.

(a) Default of BUYER. In the event of default by BUYER of payment of any instalment of the Project Price pursuant to the schedule set forth in Section 2 of this Agreement, or the failure to substantially comply with any covenant, condition, or obligations contained herein which is not cured within ten (10) business days from BUYER's receipt of written notice thereof, SELLER shall have the right to stop all installation work and to assert its contractual rights in Sections 12 and 14 herein. A notice of default shall be sent to BUYER'S attorney at the same time notice is given to BUYER. Such notice will be to: Adam Filson, Esq., Grinnell, Dubendorf & Smith LLP, One Bank Street, P.O. Box 576, Williamstown, MA 01267-0576.

(b) Default of SELLER. In the event of default by SELLER by the failure to substantially comply with any of its covenant, conditions, or obligations contained herein, which is not cured within ten (10) business days from SELLER's receipt of written notice thereof, BUYER shall have the right to stop all payments of the Project Price then not yet due and payable and to assert its contractual rights herein as well as pursue any and all equitable remedies available. A notice of default shall be sent to SELLER's attorney at the same time notice is given to BUYER. Such notice will be to: Gerhard Kelm, Esq., 103 Rowell Court, Falls Church, VA 22046.

6

10. Warranty.

    A.    SELLER warrants that the Alpine Coaster shall be manufactured according to the plans, drawings and specifications provided to SELLER (including any changes provided for in appropriate written change orders) and that all work provided by SELLER shall be of good workmanship and shall conform to to all European Safety Standards, and shall have been tested by the German TÜV (Technical Supervision Association).

    B.    Notwithstanding the warranty terms of the General Terms and Conditions set forth in Addendum C, SELLER further warrants and guarantees its workmanship and materials for a period of twelve (12) operating months after the first day that the Alpine Coaster operates while carrying members of the general public. During said period SELLER shall be responsible to repair and/or replace, any defect in materials supplied or workmanship as follows:

    C.    If BUYER asserts a defect in the Alpine Coaster exists, BUYER shall send a written report to SELLER on any defect immediately after such defect has been discovered. If a defect actually exists, it will be rectified by SELLER in the following manner. In the event of defects which impede the operational safety of the Alpine Coaster or which materially impede operations, rectification work shall commence within forty-eight (48) hours of BUYER's report of such inoperability. In the case of other defects, SELLER shall commence rectification within a reasonable period not to exceed ten (10) business days from Seller's receipt of the BUYER's written notice.

    D.    Other than the foregoing, SELLER makes no other warranties or guarantees of any sort or kind concerning the Alpine Coaster and it is expressly agreed by the parties that except for the costs of repairs and replacements made pursuant to the preceding paragraphs of this Section of the Agreement, SELLER shall not be liable for any consequential, special, incidental, exemplary, or punitive damages, or any claim for loss of profits, lost business, or lost business opportunities. SELLER's limited warranty shall not apply to: normal wear and tear; damage to the Alpine Coaster resulting from repair, alteration, or modification of the Alpine Coaster without SELLER's prior written consent; misuse of the Alpine Coaster by BUYER or BUYER's customers; or BUYER's failure to use, operate, and maintain the Alpine Coaster in accordance with SELLER's written instructions, including daily and other regular maintenance instructions to be provided by SELLER; any act of God; and unreasonable delay by BUYER; provided, that any such causes are not attributable to SELLER's failure to perform its obligations hereunder.

SELLER EXPRESSLY EXCLUDES FROM THE WARRANTIES CONTAINED HEREIN CONDITIONS ARISING FROM NORMAL WEAR AND ABRASION TO ALL PARTS SUCH AS SKIDS AND BRAKE PADS.

    E.    All costs, freight charges and customs duties for the warranted parts (including removal and replacement thereof) shall be paid by SELLER during the Warranty Period, and thereafter the freight charges and customs duties shall be paid by BUYER (i.e., ex works from Seller's manufacturing facility).

    F.    Title Warranty

SELLER warrants to BUYER that it owns and has the ability to deliver good title to the Alpine Coaster, has the right to sell the Alpine Coaster, and will deliver the Alpine Coaster free and clear of any liens or other encumbrances.

11.   Force Majeure. The following shall constitute force majeure events (collectively, the "Force Majeure Events"): (i) fire or other casualty (which is not caused by the wilful or grossly negligent act of SELLER or its employees or agents); (ii) labor disputes, floods, civil commotion, act of God, embargoes, war, riot or insurrections; (iii) the failure of BUYER to satisfy its obligations by the applicable dates set forth herein; and (iv) the Weather Conditions; provided, that in the event of such a delay (a) SELLER shall seek and use (to the extent available) economically reasonable and comparable substitutes or alternative remedies approved by BUYER and shall promptly give written notice to BUYER of the occurrence of such a delay, and upon the termination thereof, the termination of the delay. If SELLER fails to give notice to BUYER of the occurrence and termination of any such delay as provided herein within five (5) business days from the date SELLER has actual knowledge of such delay and/or the day of such termination of such delay, as the case may be, SELLER shall have deemed to have waived its right to an extension hereunder on account of such delay. In the event of any Force Majeure events, the Handing Over Date shall be extended by one day for each day any Force Majeure Event prevents SELLER from performing its obligations hereunder.

12.   Indemnification

A. (1) In the event of SELLER's breach of the warranty given in Section 10, or default by SELLER of any other term hereunder, or in the event of a product liability suit against SELLER, SELLER shall, at its own expense, defend any suit or proceeding brought against BUYER and shall fully protect and indemnify BUYER against any and all losses, liability, cost, recovery, or other expense in or resulting from such breach, default, or suit (provided, however, BUYER has fully performed all ongoing maintenance obligations). BUYER shall give prompt notice of or claim of such suit and BUYER agrees to cooperate with SELLER to enable it to make such defense.

(2) BUYER agrees to protect, indemnify, defend and hold SELLER harmless from and against any and all losses of SELLER arising out of or sustained, in each case, directly or indirectly, from any breach of representation, covenant of BUYER made herein or any default by BUYER hereunder, including without limitation, from defective/bad maintenance and/or operation of the Alpine Coaster caused by BUYER's gross negligence or wilful misconduct, (except to the extent such maintenance and/or operation was in conformity with SELLER's operation and maintenance specifications or recommendations), or non-compliance with applicable law. BUYER shall not be liable for any consequential, special, incidental, exemplary or punitive damages or any claim for lost business or lost business opportunities.

B. Notwithstanding anything to the contrary contained in this Section 12, the maximum liability of SELLER to BUYER under Section A (1), shall be the Project Price plus any and all Additional Expenses paid by BUYER pursuant to Sections 8(a), (b), (g), (h), and (j).

13.   Independent Contractor. The relationship between SELLER and BUYER under this Agreement shall be that of an independent contractor, and no partnership, joint venture, agency or employee relationship shall be implied by this Agreement. As such independent contractor, SELLER shall be solely responsible for any claims, demands, suits, costs, damages or expenses arising out of or relating to its acts or omissions or those of its employees, servants or agents or any of them.

14.   Reservation of Property Rights

   (a)   The purchased goods remain the property of SELLER until such time as full payment has been made of all amounts owed under this Agreement and all claims with respect to warranties and insurances have been settled. BUYER agrees to cooperate with SELLER in the filing of any UCC-Financing Statements in the Commonwealth of Massachusetts, upon request of SELLER or SELLER'S representative. If any payment is more than 30 days in arrears, the remaining balance shall be due immediately, or SELLER shall be entitled to immediate repossession of its property. All costs incurred in the enforcement of such action shall be borne by BUYER.

   (b)   BUYER may not dispose of the goods subject to such reservation of property rights.

8

(c)  In the case of seizure of the goods subject to such reservation of proprietary rights by third parties, in particular by court bailiffs, BUYER is to notify such third parties of the proprietary rights of SELLER and to notify SELLER without delay.

15. Termination. This Agreement may be terminated at any time:

(a) by mutual written agreement of SELLER and BUYER; or

(b) by either party in the event of a material breach by the other party of any representation, warranty, or agreement contained in this Agreement which is not cured within thirty (30) days of receipt of written notice of such breach.

16. Severability. Should any provision in this Agreement be or become unenforceable, the remaining provisions shall in no way be affected and the invalid provision shall be so interpreted as to most closely effect the economic purpose of the invalid provision.

17. Amendment. This Agreement may only be amended or modified by an instrument in writing executed by both parties.

18. Governing Law. This agreement and all legal relations between SELLER and BUYER shall be governed by the laws of the Commonwealth of Massachusetts, USA, without regard to conflict of law rules, and it is hereby agreed that any dispute of any nature whatsoever arising out of this Agreement shall be subject to the exclusive jurisdiction of the United States District Court in the District of Massachusetts.

19. MEDIATION.  If a dispute between Buyer and Seller arises in connection with this Agreement, and is not resolved, the parties shall first proceed in good faith to submit the dispute to mediation with an impartial person. The parties will jointly select an acceptable mediator and will share equally in the cost of mediation. All communications between the parties, and information disclosed in the mediation process shall be and remain confidential and may not be used in any arbitration or litigation between the parties unless such information or disclosure had been made or received prior to the mediation or is otherwise discoverable by the parties.

The mediation shall be conducted before one mediator who shall be an attorney who has practiced in the area of commercial law for at least ten (10) years or a retired judge at the District Court or appellate court level. The mediation shall be conducted in Berkshire County, Massachusetts or such other place as the parties may agree.

Any agreement entered into during mediation shall be set forth in writing and signed by both parties before the same shall be binding. The mediation, unless otherwise agreed, shall terminate in the event the entire dispute is not resolved within 45 calender days of the date written notice requesting mediation is sent by one party to the other at the party's last known address.

ARBITRATION. If the parties are unable to resolve any dispute that arises in connection with this Agreement informally or by mediation, the parties agree to submit to binding arbitration any and all claims, disputes and controversies between or among them, whether in tort, contract or otherwise arising out of or relating in any way to this Agreement.

Nothing in the preceding paragraph, nor the exercise of any right to arbitrate hereunder, shall limit the right of any party hereto to obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment, or appointment of a receiver from a court having jurisdiction, before, during or after the pendency of any arbitration proceeding. The institution and maintenance of any action for such judicial relief, or pursuit of provisional or ancillary remedies, or exercise of self-help remedies shall not constitute a waiver of the right or obligation of any party to submit any claim or dispute to arbitration, including those claims or disputes arising from exercise of any such judicial relief, or pursuit of provisional or ancillary remedies, or exercise of self-help remedies.

Such arbitration shall proceed in Berkshire County, Massachusetts, or such other place as the parties may agree. The arbitration shall be conducted before one arbitrator who shall be an attorney who has practiced in the area of commercial law for at least ten (10) years or a retired judge at the District Court or appellate court level. The parties to the dispute or their representatives shall obtain from Berkshire County Bar Association or American Arbitration Association ("AAA") a list of persons meeting the criteria outlined above. If the parties are unable to select an arbitrator within ten (10) days of receiving such lists the parties shall select the person in the manner established by the AAA.

Arbitration shall be governed by Massachusetts law, including all applicable statutes of limitation, and shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association unless otherwise agreed by the parties. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

Each party shall bear their own costs of arbitration and attorneys fees.

20. Notices. Any notices hereunder shall be in writing and shall be deemed effectively given when delivered in person or when sent by fax or registered mail to the address of the other party first above written or at such different address as such party may hereafter designate by notice.

21. Entire Agreement. The terms and conditions herein set forth the entire agreement between the parties and shall supersede all previous communications and agreements, either oral or written, between the parties with respect to the subject matter of this Agreement. This Agreement incorporates by reference the Wiegand General Terms and Conditions of Delivery, as well as the Sales and Service Agreement appended hereto as Addendum "C" and "D" respectively. To the extent any provisions in the General Terms and Conditions of Delivery or the Sales Service Agreement conflict with the terms in the body of this Agreement, the terms of this Agreement shall be controlling. This Agreement can be modified only by a written amendment executed by both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

| **BUYER** | **SELLER** |
|---|---|
| Jiminy Peak Mountain Resorts, Inc. | Wiegand Sports, LLC |
| By: *[signature]* | By: *[signature]* |
| Title: President | Title: General Manager |

10

## ADDENDUM A

Handing Over Date is the date on which the installation of the Alpine Coaster is approved by TÜV, but not later than June 15, 2006.

Expense of obtaining TÜV approval will be borne by SELLER.

**ADDENDUM B**
**GENERAL TERMS AND CONDITIONS OF DELIVERY**
**WIEGAND SPORTS, LLC**

**General**

1. Seller's General Terms and Conditions of Delivery apply exclusively to all transactions and take precedence over the Buyer's Terms of Purchase. The Buyer's Terms of Purchase are not agreed to, unless expressly agreed upon by Seller in writing.
2. These Terms and Conditions of Delivery apply to all future business transactions and do not have to be expressly agreed upon. Buyer is deemed to have accepted our terms upon acceptance of Seller's goods or services. In the event, Seller and Buyer have entered into a separate Purchase Contract, specific terms in that contract will supersede these Terms and Conditions.

**Offer/Confirmation of Order/Extent of Delivery**

1. Our offers are non-binding. The nature and scope of Seller's delivery obligation is determined solely in accordance with our written Order Confirmation. Services not mentioned in the Order Confirmation are not part of the scope of Delivery.
2. Supplementary agreements and modifications require our written confirmation in order to become legally binding.
3. Weight, power, velocity and other performance details and any illustrations, models or descriptions provided by Seller are to be regarded as approximations only. Deviations of up to 20% are permissible. Costs estimates are binding only where specifically agreed upon in writing.
4. If in our opinion a deviation from the agreed upon method of construction becomes necessary, we may, upon prior notification to the Buyer, utilize a different design or method that serves the same commercial purpose. The changed design or construction method, including any changes in the cost and delivery time caused thereby, is deemed to have been accepted by the Buyer unless an objection thereto is made in writing within 14 days from the date of mailing of the notification. In the event of a timely objection, the agreed upon design or construction method will be used, but the originally stated time of delivery may be reasonably extended.
5. Seller retains proprietary rights and copyright protection to all of its estimates, drawings, calculations, technical data and any other documents. Buyer will not divulge such information to third parties, unless necessary to obtain governmental or regulatory approvals.
6. Site inspections, pegging out on site, surveys, technical drawings and calculations are charged to Buyer separately based on time and expenses actually incurred.
7. All earthworks, grading work, as well as foundation work is the responsibility of the Buyer.

**Price/Payment/Reservation of Proprietary Rights**

1. Our prices and/or cost reimbursements are always based on delivery of products or services, ex works, excluding packaging. Packaging is charged to Buyer at cost and is not refundable. Deliveries and Orders for which fixed prices have not been expressly agreed upon are charged at the prices or hourly work rates applicable on the date of delivery plus postage, freight, packaging and value added or equivalent tax, without discount or other reduction. If payment in a foreign currency has been agreed upon, all currency or exchange rate fluctuations after the date of the Order Confirmation will be charged to Buyer, unless otherwise agreed in writing.
2. Payments are due in full in cash without deduction.
a) Money orders, cheques, drafts or bills of exchange are accepted by special agreement only, and only on account of payment due. Payor will reimburse Seller for all bank charges or other costs incurred thereby.

3. Should any payment due date be exceeded, Seller reserves the right without notification of default, to charge interest at 5% above the then applicable bank rate of the Deutsche Bundesbank for sums due and for such time as the payment remains unpaid. Partial deliveries can be calculated separately
4. Seller will retain title to all goods delivered by Seller to the Buyer until the Buyer has discharged its full obligations under the Agreement, including future obligations, and all interest costs and expenses arising hereunder. Buyer must, however, insure the goods against losses of any and all kinds. In the event of attachment, seizure or similar action by any governmental authority or other third party, the Buyer must inform Seller immediately, supply all information and make requested documentation available to Seller. In the event Seller repossesses the goods, Seller is entitled to dispose of the goods, the proceeds of which, after deducting reasonable costs of disposal, is to be credited against any amounts owed by the Buyer. If the right to retention of title as stated in the preceding paragraph is not legally valid under state law where the goods are located, the next best possible security available under the law of that state shall be applied in lieu thereof. The Buyer is obligated to assist in all measures Seller may take to protect its right of ownership in the goods.
5. Seller reserves the right to demand advance payments or to take legal steps to secure the goods or to rescind the contract if Seller has reason to believe that Buyer will default on the contract.
6. The incorporation of goods into a site or building by either Seller or the Buyer will not be deemed to change the nature of the goods from personalty to realty. Seller may at all times remove the goods until full payment is received.
7. Buyer expressly acknowledges the validity of Seller's right to retention of title. In the event of resale, the Buyer must inform his Purchaser of Seller's retention of title.

**Delivery Date/Force Majeure/Delay**

1. The agreed upon delivery time commences with the receipt of a written purchase order, receipt of all technical information required for the execution of the contract and receipt of a deposit. The delivery date is deemed to have been met if the goods are ready for delivery. The obligation to timely deliver is dependent upon Buyer's meeting all of its contract obligations.
2. Partial deliveries are permissible.
3. In the event of Force Majeure or other unforeseen circumstances which are outside Seller's control, whether such occurs at Seller's location or subcontractor's location with regard to personnel, energy or raw material shortages, or due to the order of any governmental authority, as a result of labour disputes, traffic delays, factory breakdowns or similar delivery obstacles, Seller may suspend its delivery obligation and the delivery time shall be extended for a reasonable period of time or, if the execution of the delivery is rendered substantially more difficult, to withdraw from the contract in whole or in part. This also applies when sub-contractors do not supply Seller with raw materials, but in this event Seller cedes to Buyer all claims against the sub-contractor due to the sub-contractor's failure to deliver on time. Claims for damages against Seller by the Buyer are excluded in such cases. This provision applies even if an existing delay in delivery has already occurred.
4. In the event Seller is responsible for a delay in delivery, the Buyer is entitled to demand a flat rate compensation of 0.5% of the contract value for each complete week of delay with a maximum amount payable limited to 5% of the contract value.
5. The Buyer is entitled to claim compensation for a delay in delivery time up to the total of the anticipated loss only if the delay is intentional or is due to Seller's gross negligence. The liability for compensation is limited to 20% of the proven damages, but not more than 30% of the contract price.

6. If the Buyer delays acceptance of the goods or fails in its duty to assist delivery, Seller is entitled to demand compensation for any resulting damages and costs. In such event, the risk of accidental loss or accidental damage to the goods is the Buyer's responsibility from the time the Buyer delays acceptance.

7. If the Buyer refuses to permit the execution of the contract, Seller may demand a lump sum compensation of 30% of the contract price.

Passing of Risks/Packing Costs

1. Unless stated otherwise in the Order Confirmation, the place of delivery is ex-works.
2. The risk in the goods passes to the Buyer with the delivery of goods, including any partial deliveries. If the Buyer requests a delay in delivery or delay is due to circumstances for which Seller is not responsible, the risk passes to the Buyer on the day on which we notify our readiness to deliver.
3. The Buyer will provide for secure storage for the assembly tools and provide adequate insurance therefor.
4. At the Buyer's request and cost, we will insure the delivery with an appropriate transport insurer.

Permits/Licenses

The Buyer is responsible for obtaining building permits or other permits as may be necessary in a timely manner. Cancellation or refusal to issue such permits does not entitle the Buyer to rescind the contract. All official conditions, insofar as they concern Seller's scope of delivery, will be of relevance to Seller's performance only to the extent that such have been notified to Seller in writing prior to the execution of the Contract. The costs of official inspections or tests are the Buyer's responsibility.

Warranty

1. The warranty period commences with the conclusion of installation work and is for a period of six months.
2. Seller guarantees the goods are free from defects in accordance with the current state of technology and all expressly promised design features given in writing. We reserve the right to repair or replace all parts ex-works free of charge within the warranty period if they are shown useless or considerably impaired in their use due to circumstances occurring prior to the date of delivery. Other claims such as for recission of the sale contract, price reduction or damage claims of all kinds, including consequential damages, are excluded. Seller is not liable for losses suffered by the Buyer or third parties arising from the quality of the delivered product or failure to perform any collateral duty. In the event of a repair of any defect on site, the Buyer is obliged to actively assist with the repair. Replacement parts which are provided at no cost and whose replacement does not require any special knowledge will be installed by the Buyer with no charge to Seller. We reserve the right to charge Buyer for any repairs that are necessitated due to unjustified guarantee claims or for minor damage claims.
3. If Seller is unwilling or unable to remedy defects or to deliver replacement parts, or if the repair or replacement is excessively delayed due to reasons for which Seller is not responsible, or if the repair or replacement fails or is in inadequate in some other way, the Buyer is entitled to a corresponding reduction of the contract price. The defects must however be of such serious nature, that the total use of the goods is substantially impaired. Except as contained below, other claims by the Buyer, irrespective of their legal basis, are excluded. Seller is therefore not liable for any damages which did not occur with respect to the goods themselves. Seller is not liable for loss of earnings or other loss of assets of the Buyer. The aforegoing exemption from liability is not applicable where the damage was intentional or due to gross negligence.
4. The warranty period of six months is a period of limitation, calculated from the date of delivery and applies also to claims for consequential harms caused by a defect, to the extent that no claims arising out of a tortious act are made. In the event Seller fails to acknowledge claims made in a timely manner,

the right of the Buyer to claim under the warranty expires six months from the date of the complaint, at the earliest, however, at the end of the original warranty period.

5. For parts which Seller does not manufacture, e.g. electrical equipment, special structures, etc., Seller's warranty is limited to the assignment of any claims which Seller may have against its sub-contractors.
6. Seller's liability in respect of the warranty rights of the Buyer ceases, if
a) the Buyer does not immediately or within 10 days of the discovering the defect — which the Buyer must prove — notifies Buyer in writing.
b) the goods are not maintained or treated properly and parts are not fitted properly according to instructions or if the intended use under the contract is exceeded,
c) non-original spare parts are installed,
d) the goods are repaired by the Buyer or by third parties without our consent.
7. Defects or impairment of the goods due to normal wear and tear during operations or due to chemical influences are not covered by the warranty.
8. Precondition for Seller's warranty is that the Buyer has fulfilled its contractual obligations, particularly those concerning payment.

Buyers Right to Rescind

1. The Buyer can rescind the contract in writing if Seller is in default of delivery and a reasonable extension of time (at least 6 weeks) has elapsed without delivery being effected and the Buyer notifies Seller in writing of its intention to rescind when setting the extension of time.
2. The Buyer can rescind the purchase order only when a delivery delay or product defect has resulted in a provable substantial impairment or destruction of Buyer's commercial interest in the product.

Installation

Assembly/installation services will be charged to Buyer based on costs incurred plus incidental expenses and such are payable immediately upon presentation of invoice. Any laborers hired by the Buyer must be properly insured by the Buyer. Seller is not liable for injuries sustained by labor supplied by the Buyer. The Buyer must sign the daily work sheets of Seller's workers on completion of the installation.

Liability for Subsequent Deliveries

These General Terms and Conditions of Delivery will also govern any subsequent or replacement deliveries and corrective work that Seller may perform.

Liability

Any additional liability for damages beyond that provided for in the above-stated terms is excluded, irrespective of the nature of the legal claim. This applies in particular to personal injuries that may occur during the use of Seller's sports and leisure installations. The Buyer agrees to defend against such claims by obtaining adequate liability insurance.

Concluding Provisions

1. Collateral agreements and contract amendments must be confirmed in writing by Seller in order to be legally valid.
2. Place of performance for all obligations arising out of this contractual relationship, including delivery and payment, is Seller's place of business.
3. If the purchaser is a merchant, then the competent court is the court with jurisdiction over our place of business. We reserve the right however to bring an action in the court with jurisdiction over Buyer's place of business.
4. The law of the Federal Republic of Germany applies to all claims arising out of the performance of this agreement without regard to the UN-Convention on Contracts for the International Sale of Goods.
5. If any of the provisions of these General Terms and Conditions of Delivery are deemed to be invalid, the validity of the remaining valid terms will not be affected thereby.

13

## ADDENDUM C

### SALES AND SERVICE AGREEMENT
Special Assembly Conditions

Upon request of the BUYER, SELLER will supply a construction supervisor in accordance with the following conditions.

1. The reasonable travelling costs (not to exceed 5.000U$) of the supervisor and technicians, i. e. time, mileage, air fare, as well as accommodation and board are the responsibility of the BUYER. BUYER will pay for any interim trips back to Germany for the supervisor/technician during the construction period that are necessary for the work hereunder. The allowances for boarding and lodging will be in accordance with the current travel reimbursement table published by the German Administration of Finance.
   According to the special assembly conditions the final erection at the site by two supervisors will be charge as follows:
   a.  traveling times                EUR 39,00/h
   b.  installation and waiting periods   EUR 45,00/h
   c.  room and board                 EUR 100,00/day
       If the buyer will provide free accomadation for the Supervisors the room and board pay will be reduced to 20,-- Euro a day per person.
   d.  flight costs and other costs   at actual cost with invoices
   The estimated assembly cost are 58.560 EUR which is caculated for 8 weeks with 960 working hours and 112 days of severance pay. If there will be changes in the installation time, these will be added or deducted to the above listed single prices. In case of a delivery fault of the SELLER the BUYER is not responsable for the arising waiting time hours.

2. If installation is made overseas, an automobile is to be placed at the supervisor's or Technician's disposal.

3. The BUYER is obliged to make 6 -8 able-bodied helpers available during the installation period, one or two of them must be welders and one or two grinders. Those helpers must be able to lift the construction components into position, following to the instructions and guidance of the supervisor.

4. The supervisor is permitted to refuse unsuitable helpers and to request their replacement by suitable ones.

5. Responsibility of appropriate liability insurance for the helpers must be borne by the BUYER.

6. Arrangements of the complete earthworks have to be made by the BUYER and carried out in strict accordance with the survey and plans.

7. The BUYER will place all necessary and suitable machinery at the disposal of the supervisor who decides and directs its use.

8. The BUYER is responsible for observance of any local, state or national construction regulations and codes of practice. He will inform the supervisor of any conditions imposed. The SELLER bears no liability, whatsoever, for any injuries resulting from non-observance of applicable regulations or laws.

9. The supervisor may engage the helpers to work overtime even on Saturdays and Sundays, if required.

10. The supervisor is entitled to"bad weather" payments amounting to 70 % of his pay. Minimum per day, however, are 10 hours.

11. If additional work has to be done in agreement with the BUYER in form of overtime hours, work on Sundays or holidays, the valid legal German extra charges are calculated.

12. In case of strikes or other interruptions for which neither the SELLER, nor the supervisor are responsible, the BUYER will bear the total cost of lost time (each working day is charged at 8 hours).

12. The final invoice is based on an inventory of the actual number of elements used, preferably made by the BUYER's and SELLER's staff together. The inventory and the daywork sheets are to be signed by the BUYER.

14

# ADDENDUM D

## Inspection Agreement

Wiegand Sports, LLC ("Seller") and Jiminy Peak Mountain Resort, Inc. ("Buyer") have entered into a Consulting, Purchase, Delivery, Assembly, and Inspection Contract dated November __, 2005.

In connection with the aforementioned Contract, Seller and Buyer agree upon an annual technical inspection of the installed ride. This inspection will be organized by the Seller and can be conducted by either the Seller, or TUEV or another qualified organization selected by Seller.

The responsible inspection agency/expert will be defined after completion of installation.

The costs will not exceed USD 5000,-- per year and are the responsibility of the Buyer.

The inspection does not include any expenses for maintenance or repair work and materials and spare parts, that may be recommended as a result of the inspection.

Any modification of this agreement must be in writing in order to be legally binding.

_____
Jiminy Peak Mountain Resort, Inc.
Date:

_____
Wiegand Sports, LLC
Date: